FLETCHER, Circuit Judge:
 

 This is an appeal from the district court’s judgment enforcing the bankruptcy court’s award of compensation to appellees, receiver-trustee Albert M. Rau and his attorney
 
 *421
 
 Henry Jacobowitz.
 
 [1]
 
 Appellee Jacobowitz moves to dismiss the appeal on the basis that the appellant named in the notice of appeal is Southwestern Media, Inc. (Southwestern Media), an Arizona corporation, which has no standing to appeal because it was not a party to the proceedings before the district court. Plaintiffs in the district court case were a group of minority shareholders, Southwestern Media Group (SWM Group). We deny the motion to dismiss, affirm the award to Rau, and reverse and remand the award to Jacobowitz.
 

 FACTS
 

 Southwestern Media, was formed in 1976 to buy and operate a radio station in Phoenix, Arizona. Southwestern Media purchased from KBUZ, Inc. (KBUZ) two broadcasting licenses and broadcasting equipment for $1,200,000, paying $200,000 down and issuing to KBUZ a promissory note for the $1,000,000 balance. The note was secured by the transferred assets, and the principal shareholders personally guaranteed $400,000 of the deferred purchase price.
 

 On April 6, 1978, Southwestern Media filed a Chapter XI bankruptcy petition. At the time, the corporation had liabilities of $1,721,890 but assets at book of only $1,113,-032, resulting in a deficit net worth of $608,858. On July 3, 1978, the SWM Group estimated the fair market value of the corporation’s assets to be approximately $1,800,000.
 

 Albert Rau was appointed receiver on June 26, 1978 and trustee on August 2, 1978. Attorney Henry Jacobowitz represented Rau in both of Rau’s capacities.
 

 When Rau began his duties, he found the corporation in serious financial difficulty and in danger of going off of the air, which would have decreased Southwestern Media’s value. Rau kept the stations running while he and Jacobowitz looked for a purchaser. Tentative agreement was reached on a sale to Capitol Radio, Inc. This buyer agreed to purchase all assets for $1,500,000, subject to KBUZ’s lien that secured a promissory note of $1,000,000 plus interest, and to assume the promissory note or issue its own note to the bankruptcy court.
 

 Before this sale was confirmed, another prospective purchaser called the Forney Group made a more favorable offer, to purchase the station for $1,850,000, also subject to the lien securing the KBUZ note. The Forney Group, as had Capitol Radio, agreed to obtain the release of the two shareholders from their personal guarantees to KBUZ. KBUZ agreed not to oppose the sale as long as the Forney Group met certain conditions and assumed the promissory note. Provided the same conditions were met, KBUZ also agreed to reinstate the promissory note’s term-payment provisions. The bankruptcy court approved and confirmed the sale. The Forney Group paid $160,000 down and later paid $142,000 in expense money, which the trustee used to operate the station. When the Forney Group could not post a letter of credit, the bankruptcy court cancelled the sale and ordered the trustee to refund the $160,000 down payment, but not the $142,000 expense money.
 

 Rau was thus forced to raise $160,000 to repay to the Forney Group, and to find a new buyer. Meanwhile, as a result of a successful change in format, the value of the radio station licenses increased. Western Cities Broadcasting, Inc. (Western Cities) offered to purchase the station’s licenses and other assets for $2,500,000 in cash, the assets to be transferred free and clear of all liens. The form of this transaction enabled the trustee to pay the outstanding balance on the KBUZ note, secure the release of the lien, and thereby elimi
 
 *422
 
 nate the need to obtain KBUZ approval of the buyer. In addition, the terms of the sale allowed the trustee to make the refund to the Forney Group and to pay for operating expenses. The bankruptcy court approved the sale to Western Cities on August 7, 1979. The sale was closed on February 15, 1980. On that same day, the remaining purchase price was collected and the KBUZ promissory note was paid. By the end of 1980, over $600,000 had been distributed to the two shareholder groups. All creditors were paid in full, and more money may be returned to the shareholders in the future.
 

 On April 8, 1981, Rau and Jacobowitz applied for final compensation for their services in connection with the bankrupt estate. Rau requested $15,000 for his services as receiver and $66,020.06 for his fee as trustee. Jacobowitz asked for $5,000 for his work as attorney for Rau in his capacity as receiver and for a fee of $51,712.23 for his services on behalf of Rau in his capacity as trustee. The bankruptcy court approved these requested fees. In its order granting the fees, the court stated that the requested fees were “fair, reasonable and proper,” and that the administration of the estate had been “very successful.” The bankruptcy court further ordered $71,617.43 paid into the referees’ salary and expense fund.
 

 The SWM Group of minority shareholders appealed from the fee awards to the district court, which affirmed. The SWM Group’s attorney then filed a timely notice of appeal to this court. On the notice of appeal, “Southwestern Media, Inc.,” rather than “the SWM Group,” was listed as the appellant. We consider the variance to constitute a simple misnomer
 
 [2]
 
 and turn to the merits of the appeal.
 

 DISCUSSION
 

 I.
 
 Standard of Review
 

 A trial court has discretion to determine reasonable compensation for services rendered in bankruptcy proceedings.
 
 See In re THC Financial Corp.,
 
 659 F.2d 951, 954 (9th Cir.1981),
 
 cert. denied,
 
 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982). Such a fee award will be upheld unless the awarding court abused its discretion or erroneously applied the law.
 
 See In re York International Building, Inc.,
 
 527 F.2d 1061, 1068 (9th Cir.1975). The bankruptcy court’s findings of fact are binding on the district court and this court unless clearly erroneous.
 
 See In re Howell,
 
 638 F.2d 81, 82 (9th Cir.1980). Because appellate courts are competent to assess the value of services rendered in a bankruptcy proceeding, however, we are not bound by the bankruptcy court’s evidentiary finding that a particular fee rate is reasonable.
 
 See In re York International Building, Inc.,
 
 527 F.2d at 1068.
 

 II.
 
 The Trustee’s Fiduciary Duty
 

 The SWM Group argues that Rau as trustee was guilty of a conflict of interest and breached his fiduciary duty by structuring the sale in a way that both increased his fee by $22,722, and cost the estate an additional $30,084 in extra commissions paid to the referees’ salary and expense fund.
 
 [3]
 

 
 *423
 
 The appellants’ challenge to the trustee’s actions in this case is based upon the following theory. Under the Bankruptcy Act, a trustee’s maximum compensation is calculated as a percentage of “all moneys disbursed or turned over by [the trustee] to any persons, including lienholders.” 11 U.S.C. § 76(c) (1976). When assets of the estate are sold free and clear of liens held by secured creditors, the entire sale price, including the amount used to pay off the liens, is counted for purposes of establishing the trustee’s fee base.
 
 See
 
 2
 
 Collier on Bankruptcy
 
 ¶ 326.01[4][b] (15th ed. 1982);
 
 see also
 
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 327 (1977), U.S.Code Cong. & Admin. News 1978, p. 5787 (similar rule applies under Bankruptcy Reform Act). The appellants, however, contend that when an encumbered asset is sold to a third party purchaser subject to the existing lien, only the equity proceeds from the sale may be considered in calculating the trustee’s maximum fee. Therefore, the appellants argue, by selling the radio station “free and clear” of the KBUZ lien, rather than “subject to” that lien, Rau as trustee chose to structure the transaction in a way that resulted in his own personal gain at the expense of the estate. The appellants maintain that this was a breach of fiduciary duty by the trustee.
 

 The contention that a sale subject to existing liens does not incorporate the value of the encumbered portion of an asset into the trustee’s fee base finds some support in existing authorities.
 
 See
 
 2
 
 Collier on Bankruptcy
 
 ¶ 326.01[4][b] (15th ed. 1982);
 
 American Surety Co. v. Freed,
 
 224 F. 333, 338-39 (3d Cir.1915). The proffered interpretation, however, is not necessarily consistent with the policy underlying the statutory provision allowing sale proceeds used to liquidate liens to be counted in determining the trustee’s fee maximum. Under the old Bankruptcy Act as under the new Reform Act, the provision serves “the purpose of insuring to trustees compensation commensurate with the trustees’ services.” 2
 
 Collier on Bankruptcy
 
 ¶326.-01[4][b], at 326-17 (15th ed. 1982). The statute recognizes that the trustee’s administration of an estate containing encumbered assets may sometimes prove equally difficult and time-consuming as if the assets were unencumbered. Insofar as it is solely designed to procure a just fee for the trustee, this policy appears to be unaffected by whether the eventual disposition of the encumbered assets is “free and clear of” or “subject to” the liens.
 
 [4]
 
 For this reason, courts have sometimes treated the sale of an encumbered asset as one that includes a constructive disbursement to the lien creditor, even as to the portion of the asset’s value that does not actually enter the estate and is not distributed to the creditor by the trustee.
 
 See, e.g., In re Lowell Textile Co.,
 
 288 F. 989, 990 (D.Mass.1923);
 
 In re Breakwater Co.,
 
 220 F. 226, 228-29 (E.D.Pa.1915);
 
 In re Morse Iron Works & Dry Dock Co.,
 
 154 F. 214 (E.D.N.Y.1906);
 
 but see American Surety,
 
 224 F.2d at 338-39;
 
 In re Old Oregon Manufacturing Co.,
 
 236 F. 804, 805 (W.D.Wash.1916) (refusing to apply such a constructive disbursement theory to a sale subject to mortgage). These cases involved the sale of encumbered property to the lien creditor in exchange for release of the lien, rather than sale to a third party subject to the lien. But this court held in
 
 York
 
 that the encumbered portion of an asset could be included in the trustee’s fee base, even though the asset was sold by the trustee subject to the mortgage. 527 F.2d at 1074 & n. 12 (9th Cir.1975). We see no per
 
 *424
 
 suasive reason why an equity sale subject to an existing lien should not be considered a constructive disbursement to the lien creditor.
 

 However, we need not decide how the trustee’s fee base would have been defined had the stations been sold subject to KBUZ’s lien, because the sale by Rau did not in any event constitute a breach of fiduciary duty. 11 U.S.C. § 76(c) (1976) does not
 
 require
 
 the trustee’s fee to comprise a fixed percentage of “disbursements,” including payments on liens. Rather, it merely imposes a maximum limit on the trustee’s compensation.
 
 See In re Schautz,
 
 390 F.2d 797, 800-01 (2d Cir.1968). If the court were to determine that the trustee has manipulated the management of the estate to inflate his fee base, rather than to benefit the estate, or that the trustee’s services were not commensurate with the maximum fee, the court need not award the maximum fee.
 
 Id.
 
 at 801. As the court wisely observed in
 
 In re Lowell Textile Co.,
 
 288 F. 989 (D.Mass.1923), a case that involved a sale of mortgaged property:
 

 Whether fees ought to be allowed on such sales is a very different question from whether they can be allowed. It by no means follows that, if trustees selfishly or improvidently seek and obtain authority to take and liquidate property subject to liens, they ought to be allowed commissions on the gross amount if there has been no proportionate benefit to the estate. Where, as here, the net result of the trustee's efforts has been to increase the amount of the estate, [we] see no sufficient reason why [the trustee] should not be paid for the work and responsibility of the liquidation. A commission upon only the surplus realized would in most cases be entirely inadequate.
 

 Id.
 
 at 990.
 
 [5]
 

 Since the form of the sale transaction only increased the maximum fee that could be awarded to Rau as trustee, and did not govern the amount he would actually receive, his decision to structure the transaction as he did was not the product of a conflict of interest. For the same reason, his decision did not breach any fiduciary duty. The bankruptcy court, not the form of the sale, ultimately determined the fee that Rau received.
 

 The appellants further challenge Rau’s sale of the radio station “free and clear” of the KBUZ lien because it resulted in a higher payment from the estate to the referees’ salary and expense fund.
 
 [6]
 
 Unlike the trustee’s fee, which rests within the court’s discretion, the contribution of a bankrupt estate to the referees’ fund is fixed according to a scheduled percentage of the “net proceeds realized” on the sale of assets of the estate. “Net proceeds realized” includes “the entire sale price of encumbered property when sold free and clear of all liens.”
 
 In re Riverside Investment Partnership,
 
 674 F.2d 634, 636 (7th Cir.1982) (emphasis deleted) (quoting
 
 Reports oí the Proceedings of the Judicial Conference of the United States
 
 22 (1966)). The Judicial Conference rule further provides that “where property is sold or transferred subject to a valid existing mortgage, lien or other encumbrance, the amount of such mortgage, lien or other encumbrance not affected by such sale shall not be included in determining the amount of net proceeds realized.”
 
 Id.
 
 (emphasis deleted). Based on this distinction, the appellants argue that by selling the radio station free and clear of the KBUZ lien, rather than subject to the lien in a manner that would leave the lien unaffected, Rau unnecessarily increased the commission due the referees’ fund and thereby breached his duty to conserve assets of the estate.
 

 
 *425
 
 We cannot accept the appellants’ argument.
 
 [7]
 
 By so holding, we would effectively rule that a trustee (under the Bankruptcy Act) must sell encumbered property subject to rather than free and clear of existing liens whenever it is reasonably possible for him to do so. In some cases, however, a trustee may have good reasons for selling estate assets free and clear of liens, while in other cases a sale subject to liens may provide the more profitable approach. In this instance, it appears that the trustee had sound reasons for selling the stations free and clear of the lien.
 
 [8]
 
 The decision concerning the form of sale therefore rested within the business judgment of the trustee. Liability will not be imposed for the exercise of such judgment, absent negligence.
 
 See Mosser
 
 v.
 
 Darrow,
 
 341 U.S. 267, 272-73, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951);
 
 In re Cochise College Park, Inc.,
 
 703 F.2d 1339, 1357 (9th Cir.1983). The bankruptcy court in this case did not find any negligence by Rau as trustee;
 
 [9]
 
 in fact, it specifically approved all relevant transactions. Given the substantial profit realized by Rau on the liquidation of a previously insolvent estate, we cannot find error in the bankruptcy court’s approval of his conduct.
 

 III.
 
 Reasonableness of Fees Awarded to Rau
 

 Even though we have determined that Rau did not act improperly, and even though his fee was within the maximum allowed by statute, we must still examine the fee awarded to make certain that it is reasonable. The appellants contend that the $15,000 Rau obtained as receiver and the $66,020 he was awarded as trustee were unreasonable and excessive based on the number of hours he worked. The appellants further argue that Rau’s failure to keep time records should reduce the number of hours for which he may receive compensation.
 

 The bankruptcy court found that the fees were reasonable and proper, partly because
 
 *426
 
 of the favorable results of the bankruptcy administration, and also because the receiver’s fee was substantially below the authorized maximum. The district court upheld this determination as a proper exercise of discretion. We affirm.
 

 For purposes of calculating fees in bankruptcy, the time spent on behalf of the estate is very important in determining what is reasonable and fair compensation.
 
 In re Beverly Crest Convalescent Hospital, Inc.,
 
 548 F.2d 817, 820 (9th Cir.1976). In order for the debtor, the creditor, and the court to analyze the fee requests, the receiver-trustee and his attorney should keep accurate records of the time spent on behalf of the estate.
 
 Id.
 

 Rau, however, kept no time records. Instead, he estimated that he spent four hours a day, working on the matter, including weekends, during the time he was receiver, a post he held from June 26, 1978 until August 2, 1978, a total of 38 days. This estimate yields a figure of 152 hours worked by Rau as receiver. Rau also estimated that as trustee he spent 1500 to 2000 hours until February 15, 1980, and then between ten and fifteen hours a week for the next eight or nine months. We derive 1850 hours (using his lower estimate) or 2600 hours (using his higher figure).
 

 The bankruptcy court did not make a specific finding as to how many hours Rau worked, although it implicitly accepted his estimates. For purposes of reviewing the reasonableness of his fee, we assume in light of Rau’s failure to keep proper time records that he actually worked the lowest number of hours consistent with his estimates.
 
 See Beverly Crest,
 
 548 F.2d at 820-21;
 
 York,
 
 527 F.2d at 1073.
 

 In the situation where the same individual serves as both receiver and trustee, we have found it proper to aggregate both the hours worked and the fee received in each capacity when assessing the reasonableness of his fee.
 
 E.g., Beverly Crest,
 
 548 F.2d at 82. The reason for this is that the statutory limit on a trustee’s fee imposed by 11 U.S.C. § 76(c) (1976) is independent of the limit on a receiver’s fee imposed by 11 U.S.C. § 76(a) (1976). In some cases, one or the other of these fee limitations may yield the receiver-trustee an unduly low maximum, so that it is proper to compensate the receiver-trustee by raising the fee he receives in his other capacity above the fee that is otherwise reasonable for his services in that capacity, measured on an hourly basis. As long as the aggregate fee received as receiver and trustee is reasonable, it can be sustained under the rule of
 
 Beverly Crest.
 

 Rau’s $66,020 award, which was the maximum he was allowed as trustee, averages approximately $35 per hour over 1850 hours of work. This rate is less than the $50 per hour we held to be a proper fee in
 
 Beverly Crest,
 
 548 F.2d at 821. As receiver, Rau was compensated less than the maximum authorized by statute, but at a rate of approximately $98 per hour, which is higher than the $85 per hour rate that we found clearly excessive in
 
 Beverly Crest.
 
 However, when we average Rau’s receiver and trustee fees,
 
 see id.,
 
 the total award for 2002 hours averages approximately $40 per hour. We do not find this rate unreasonable or excessive.
 

 We reach this conclusion even though, as the SWM Group contends, Rau had assistance in running the stations,
 
 see Rose Pass Mines, Inc. v. Howard,
 
 615 F.2d 1088, 1091 (5th Cir.1980) (per curiam), received other income during this time period, and was reimbursed for his expenses.
 
 [10]
 
 The factors to be assessed in calculating a reasonable fee include “the nature, extent, and value of the services rendered as well as
 
 *427
 
 ... the conservation of the estate and the interests of creditors.” Bankr.R. 219(c)(1). Considering the success of the bankruptcy, which paid all creditors in full and returned a large sum of money to the shareholders partly as a result of Rau’s diligent efforts, the fee award of $40 per hour was well within the bounds of reasonableness.
 
 [11]
 

 Cf. Beverly Crest,
 
 548 F.2d at 821 ($50/hour called a reasonable fee);
 
 In re U.S.A. Motel Corp.,
 
 521 F.2d 117, 119 (9th Cir.1975) (per curiam) (excessive fee reduced to $35/hour).
 

 IV.
 
 Compensation of Attorney Jacobowitz
 

 Jacobowitz, unlike Rau, documented the time he and another member of his firm spent in the bankruptcy proceedings. As attorney for Rau as receiver, Jacobowitz worked 37 hours and received $5,000; as attorney for Rau as trustee, he received $51,000 for 340 hours of work. The $56,000 award for 377 hours averages approximately $148 per hour. The bankruptcy court, in finding the award reasonable and proper, was impressed with the success of the bankruptcy proceedings, in that there was a total return to the creditors and a distribution to the shareholders. The district court concluded that although Jacobowitz’s hourly wages were high, they were not excessive in light of the bankruptcy court’s discretion.
 

 The bankruptcy court did not determine the amount Jacobowitz would have charged private clients during the time he worked in connection with the Southwest Media bankruptcy. Nor was there any evidence concerning prevailing rates for comparable work in the private sector in the Phoenix area. Jacobowitz, however, testified that his usual hourly rate was about $100 in 1978 and rose to the range between $125 and $150 in 1981.
 
 [12]
 
 Thus, according to Jacobow-itz’s own testimony, the rate of $148 per hour that he requested and received for work between 1979 and 1981 significantly exceeded the rate he would have charged private clients for the same work. The SWM Group maintains that the bankruptcy court abused its discretion by awarding such a fee.
 

 The primary method used to determine a reasonable attorney fee in a bankruptcy case is to multiply the number of hours expended by an hourly rate.
 
 See, e.g., In re THC Financial Corp.,
 
 659 F.2d 951, 954-56 (9th Cir.1981);
 
 In re Beverly Crest Convalescent Hospital, Inc.,
 
 548 F.2d 817, 820-21 (9th Cir.1976). Under the Bankruptcy Act, we have held that the proper hourly rate should be calculated with a “strict rule of economy.”
 
 [13]
 

 See THC Financial Corp.,
 
 659 F.2d at 955 n. 2. In that decision, we observed that
 

 
 *428
 
 two propositions emerge clearly from our cases and dispose of this appeal: (1) An award [of fees under the Bankruptcy Act] must be compensatory. It may not be simply a token of thanks or reward for good services. (2) The ceiling on any permissible award lies below that which is charged for equivalent services in the private market.
 

 Id.
 
 at 954.
 

 Judged by this standard, the hourly rate of $148 accorded Jacobowitz appears to have been excessive, since it was considerably higher than his comparable private rate. Jacobowitz, however, takes the position that the fee was reasonable when viewed in light of the size of the estate, the nature and extent of the undertaking, the opposition encountered, and the results achieved. He particularly stresses the successful outcome of the bankruptcy as a justification for an enhanced fee, citing
 
 Rose Pass Mines, Inc. v. Howard,
 
 615 F.2d 1088, 1092 (5th Cir.1980), where the court allowed recovery at a rate above the attorney’s regular private rate because the bankruptcy was successful.
 

 We considered and rejected a similar argument by the attorney in
 
 THC Financial Corp. See
 
 659 F.2d at 955 n. 2.
 
 [14]
 
 We there stated that “bonuses” cannot properly be awarded to attorneys in successful bankruptcy cases.
 
 Id.
 
 at 955. In this case, we must reiterate our holding that “[excellent work is ... not a basis for an enhanced award in excess of normal charges.”
 
 Id.
 
 at 954.
 
 [15]
 
 Jacobowitz’s award, which coneededly consisted partly of a “bonus” element, was improper and excessive.
 

 We accordingly reverse the award of fees to Jacobowitz, and remand for a determination of the proper fee by the bankruptcy court. In calculating a reasonable hourly rate, that court should consider (1) the rate normally charged by Jacobowitz in comparable private cases during the period in question, (2) the prevailing hourly rate for comparable bankruptcy work in the Phoenix area, and (3) the number of the hours of work claimed by Jacobowitz, if any, that were actually performed by others whose services are generally billed at a lower rate.
 
 [16]
 

 See id.
 
 at 956. On remand, the court should take further testimony, if necessary, and make an award in accordance with the principles set forth in this opinion and in
 
 THC Financial Corp.
 

 AFFIRMED in part, REVERSED in part, and REMANDED.
 

 [1]
 

 . This case is governed by, and all citations are to, the Bankruptcy Act of 1898 (the “Bankruptcy Act”), ch. 541, 30 Stat. 544 (codified as amended at 11 U.S.C. §§ 1-1103 (1976)). Although the Bankruptcy Act was repealed by the Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, § 401(a), 92 Stat. 2682 (1978), the Bankruptcy Act remains applicable to cases in which the original petition was filed before October 1, 1979, which was the effective date of the Bankruptcy Reform Act, see Pub.L. No. 95-598, § 402(a), 92 Stat. 2682 & § 403(a), 92 Stat. 2683 (1978);
 
 In re Cochise College Park,
 
 703 F.2d 1339 at 1344 n. 1 (9th Cir.1983).
 

 [2]
 

 . Under the circumstances of this case, we view the listing of Southwestern Media, Inc. rather than the SWM Group on the notice of appeal as a mere misnomer. No one was misled as to the true identity of the appellant.
 
 See
 
 9 J. Moore, B. Ward. & J. Lucas,
 
 Moore’s Federal Practice
 
 ¶ 203.17, at 3-70 (1982 ed.). Also, the original challenge to the fee award by the minority shareholders was, we think, technically derivative in form, and any recovery by the shareholders would have been channeled through Southwestern Media, Inc., the corporation. The cases cited by the appellee are distinguishable. In particular, this is not a case where a party is being added or where a nonexistent person appealed.
 
 Cf. Cook & Sons Equipment, Inc.
 
 v.
 
 Killen,
 
 277 F.2d 607, 609 (9th Cir.1960) (failure to name individual defendants on notice of appeal was “more than clerical error”);
 
 Penwell v. Newland,
 
 180 F.2d 551, 553 (9th Cir.1950) (“appeal by [deceased] person is not an unsubstantial ‘procedural irregularity’ ”). We therefore deny the motion to dismiss.
 

 [3]
 

 . Appellees argue that the SWM Group is improperly making a collateral attack on the final order approving the sale. We disagree. Appellants are not attempting in this proceeding to vacate the sale, but to prevent the trustee from receiving a fee based in part upon the sale proceeds that were used to pay off the lien.
 

 [4]
 

 . Where the trustee
 
 abandons
 
 rather than sells the encumbered property, it is settled that the value of the property so disposed cannot be used in computing his fee maximum.
 
 See In re Hinkle,
 
 15 B.R. 572, 573 (Bkrtcy.Kan.1981) (Reform Act); H.R.Rep. No. 595, 95th Cong., 1st Sess. 327 (1977),
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5963, 6284 (Reform Act).
 

 We agree with the Second Circuit that from a policy standpoint,
 

 The crucial test seems to be ... whether or not the particular property or fund has been justifiably administered in the bankruptcy court, or whether or not the trustee has properly performed services in relation thereto.
 

 In re Schautz,
 
 390 F.2d 797, 800 (2d Cir.1968) (quoting 2 Moore,
 
 Collier on Bankruptcy
 
 ¶ 48.-07[2.1], at 1802 (14th ed. 1966)).
 

 [5]
 

 . The trustee’s fee is further limited by an overall requirement of reasonableness.
 
 See In re York International Building Corp.,
 
 527 F.2d 1061, 1068-69 (9th Cir.1975).
 

 [6]
 

 . Under the Bankruptcy Act, a contribution to the referees’ salary and expense fund was collected in each case and was used to pay the salaries and expenses of bankruptcy referees and judges on a nationwide basis.
 
 See
 
 11 U.S.C. § 68(c)(4) (1976) (repealed 1978).
 

 [7]
 

 .We do not necessarily agree with the premise of the appellants’ argument, that the encumbered portion of the radio station assets would have been excluded from the basis for calculating the referees’ fund commission had Rau sold the stations subject to the KBUZ lien to the Forney Group or another similar purchaser. Even granting the deference due the Judicial Conference guidelines for interpreting 11 U.S.C. § 68(c)(2) (1976),
 
 see Mesa Farm Co. v. United States,
 
 475 F.2d 1004, 1007-08 (9th Cir. 1973), it is at least arguable that a lien is “affected” whenever it is transferred from the bankrupt estate to a solvent third party.
 
 But see In re Riverside Inv. Partnership,
 
 674 F.2d 634 (7th Cir.1982) (adopting narrower view). In Mesa
 
 Farm Co.,
 
 we upheld that aspect of the Conference guideline that mandates a commission on the entire sales price when an asset is sold “free and clear” of a creditor’s lien.
 
 Id.
 
 at 1006. We observed that
 

 [t]he cash proceeds received from a partial liquidation of an estate are not necessarily related to the estate’s size. In the instant case, an estate valued at over $1,335,000.00 produced only $225,000.00 cash. In light of the foregoing, the Conference rule interpreting ‘net proceeds realized’ to include all assets coming into the estate is justifiable.
 

 Id.
 
 at 1008. The policy of compensating the referees’ fund according to the gross value of assets administered in the estate, not merely the proceeds distributed after liens on those assets are eliminated, applies equally to a sale of the assets subject to the existing liens, at least so long as the sale produces a surplus over the encumbrance and thus does not effectively constitute an abandonment. However, we need not decide when a lien is “affected by” a sale of the encumbered asset by the bankrupt estate, in light of our conclusion below that the trustee in this case did not breach any duty to the estate even if the form of the sale did increase the amount payable to the referees’ fund.
 

 [8]
 

 . Jacobowitz, who initiated the sale to Western Cities, testified that he consciously arranged the sale free and clear of the lien to keep control over the sale and to assure that nothing would go wrong because he did not want to risk giving KBUZ, the lienholder, any control over the buyer or the terms of the sale. The record indicates that KBUZ had successfully objected to one buyer and listed numerous conditions to its approval of the Forney Group’s sale. Thus, the SWM Group has not demonstrated even a mistake in business judgment by the trustee or his attorney.
 

 [9]
 

 . The appellants did not phrase their objection below as a claim of breach of fiduciary duty but argued only that the trustee’s fee and referees’ fund commission were improperly inflated by the form of the sale. Implicit in the court’s rejection of this contention was a finding that the trustee did not act improperly or negligently by structuring the sale as he did.
 

 [10]
 

 . A bankruptcy rule provides that a trustee’s fee shall be his full compensation for services rendered “but shall not be deemed to cover expenses necessarily incurred in the performance of his duties.” Bankr.R. 219(c)(2). The SWM Group contends that Rau’s expenses, which included clerical work, mileage, stationery, postage, and long distance phone calls, are not properly reimbursible under Rule 219(c)(2). The district court found that the expenses should not be included in the trustee’s personal compensation because they were of the type necessarily incurred in the performance of a trustee’s duties. We agree.
 

 [11]
 

 . We do not challenge the estimate of hours, because the bankruptcy court apparently found it reasonable. We would much prefer to base judgments of reasonableness of fees on accurate hourly records. In proper cases, the bankruptcy court could exercise its discretion to decrease or disallow fees where time records are not kept.
 

 [12]
 

 . At the hearing in 1981, Jacobowitz testified that: (a) he did not have a precise standard hourly rate, but that in 1978 it was about $100, the same or $10 or $15 more in 1979, and between $125 and $150 in 1981; (b) in those areas where he did charge on a strict hourly basis, his minimum for the previous two or three years had been $125 to $150; (c) much of his work is not in the bankruptcy field, and that he had not been engaged to represent receivers or trustees during the past three or four years; and (d) he had requested a fee of nearly $200 per hour in a bankruptcy case in 1980.
 

 [13]
 

 .In enacting the Bankruptcy Reform Act of 1978, Congress specifically disapproved of this circuit’s “spirit of economy” rule to the extent that it calls for attorney compensation to fall below the prevailing market rate.
 
 See
 
 H.R. Rep. No. 595, 95th Cong., 1st Sess. 329-30 (1977). This revised standard does not apply to the present case, which arises under the Bankruptcy Act. Section 403(a) of the Bankruptcy Reform Act stated:
 

 A case commenced under the Bankruptcy Act, and all matters or proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act had not been enacted ....
 

 Pub.L. No. 95-598, § 403(a), 92 Stat. 2683 (1978).
 

 Even under the new rule, however, Jacobow-itz’s fee would be reversed as excessive, because it exceeded “the cost of comparable services other than in a case under this title.”
 
 See
 
 11 U.S.C. § 330(a)(1) (Supp. V 1981).
 

 [14]
 

 .
 
 THC
 
 was decided subsequent to the trial court decision in this case.
 

 [15]
 

 . Obversely, inadequate work
 
 may
 
 serve as a basis for a reduced fee.
 

 [16]
 

 . The SWM Group argues that in determining a reasonable fee, we should penalize Jacobow-itz because he shares responsibility for both structuring the sale free and clear of the lien and for Rau’s failure to keep time records. The first claim is without merit in light of Part II of this opinion. The second claim, however, is not so easily disposed of because an attorney does have a duty to insist that a receiver-trustee keep accurate time records.
 
 York,
 
 527 F.2d at 1077, 1080.
 

 There is no evidence on this point in the record, but Jacobowitz stated in his brief to the district court that “the argument of the SWM Group that [Rau] ought to have submitted a time log of his activities, or that his fee should be based upon a computed hourly rate is, we submit, sheer nonsense.” We are surprised, in light of Jacobowitz’s 24 years of bankruptcy practice, that he was unaware of our requirement that receivers and trustees, as well as attorneys, must keep accurate time records of their work.
 
 See Beverly Crest,
 
 548 F.2d at 820. Although in this case we decline to penalize Jacobowitz, in the future we may penalize attorneys who do not insist that receivers and trustees keep accurate time records.