**In re Magdeline Georgetta REID, Debtor.**

**No. 90–61188.**

United States Bankruptcy Court,
W.D. Missouri,
Southern Division.

June 29, 2000.

**514**

J. Kevin Checkett, Checkett & Pauly, Carthage, MO, for Movant.

James R. Jarrow, Kansas City, MO, for Debtor.

Jerry L. Phillips, Office of the United States Trustee, U.S. Courthouse, Kansas City, MO, for U.S. Trustee.

### MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Chief Judge.

The Chapter 7 trustee offered a document captioned Trustee's Final Report, Application for Final Compensation and Reimbursement of Expenses, and Proposed Distribution (the Final Report).[1] In conjunction with the Final Report, the trustee also filed Application of Checkett & Pauly for Allowance and Payment of Compensation and Reimbursement of Expenses (the Final Application). The United States Trustee (the UST) filed a Comment to the Final Report, and debtor Magdeline Reid filed objections to both the

1. Tr. Ex. # 1.

2. *See* Doc. 849 and 859.

3. At the time this case was filed, it was assigned to Judge Karen M. See. Judge See

Final Report and the Final Application.[2] In her objection to the Final Report, Ms. Reid also asked for sanctions in the form of attorney's fees and expenses that were incurred because of alleged errors committed by the trustee. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I will allow in part, and disallow in part, the trustee's compensation, the attorney's fees, and the expenses applied for in the Final Report and Final Application. I will also deny Ms. Reid's motion for sanctions.

### FACTUAL BACKGROUND

On November 19, 1990, debtor Magdeline Reid filed this bankruptcy case under Chapter 11. On May 21, 1991, the case was converted to Chapter 7, and on June 25, 1991, J. Kevin Checkett was appointed as the Chapter 7 trustee.[3] After more than nine years and much litigation, the case is now ready to close. The Final Report indicates that as of April 28, 2000, the estate had received $6,574,404.84 and had disbursed $6,545,576.38. The balance remaining in the estate as of that date was $28,828.46. The $6,545,576.38 disbursed includes payments to Ms. Reid for her allowed exemptions in the amount of $8,900.00, for which the trustee is not allowed compensation, thus, the compensation is calculated on the sum of $6,565,504.84 ($6,545,576.38 + $28,828.46—$8,900.00). The trustee is requesting maximum compensation pursuant

presided over all of the proceedings until she resigned from the bench on January 31, 1999. At that time the case was reassigned to the undersigned.

to section 326(a) of the Bankruptcy Code (the Code) in the amount of $34,526.35 in fees and $1,007.83 in expenses. In addition, the trustee is requesting attorney's fees and expenses for the period extending from July 1, 1998, to January 25, 2000, in the amount of $4,897.95 in fees and $1,597.69 in expenses.

While many of the facts of this case are not relevant to this Court's determination of final trustee compensation, the following must be articulated. At the time the case was filed, Ms. Reid and her then husband, Al Reid, owned and operated Wilderness Safari Park, a wild animal park in Branson, Missouri, through an entity known as Reid Enterprises, Inc. (REI). It was initially determined that Ms. Reid and Mr. Reid each owned 50 percent of REI. In December of 1992, however, this Court approved an Amended Settlement Agreement (the Agreement) that distributed 16 percent of REI to one Russell Soper in settlement of state court litigation.[4] Under the Code, a debtor ordinarily would receive nothing from the estate until all creditors' claims had been paid in full. And, a trustee ordinarily would receive no commission on moneys distributed to the debtor. The Agreement, however, provided that after Mr. Trois, an unsecured creditor in the case, had been paid all but $1,000,000.00 of his punitive damages' claim, Ms. Reid would be paid equally with him. In other words, the Agreement elevated Ms. Reid's priority to that of Charles Trois, one of two remaining unsecured creditors in the case.[5] This Court has already interpreted that Agreement for purposes of determining the formula for the disbursement of the remaining funds in the estate.[6]

Thus, Paragraph (9)(c) of the Agreement provides that, as to the last $1,000,000 in punitive damages the trustee pays to Mr. Trois, Ms. Reid is to be paid a like amount. And, that same paragraph provides that the trustee "shall receive a commission of 3% on all distributions made under paragraph 9,"[7] including the distributions to Ms. Reid. To date, Ms. Reid has been paid a total of $483,093.65 by the trustee.

Both Al Reid and the trustee wanted to sell Wilderness Safari Park, therefore, on April 9, 1993, Judge See entered an Order that authorized the trustee to vote the estate's 42 percent ownership interest in REI in favor of a sale.[8] The Order states that the "objections to the Motion [to vote stock] are overruled because: (a) Section 363 of the Bankruptcy Code does not apply to the trustee's Motion since the Trustee is asking for the authority to vote stock and not to sell property of the bankruptcy estate."[9] As a result of that Order, the trustee voted in favor of the sale, and REI sold Wilderness Safari Park for $10,500,-000.00. The estate realized a net benefit of $3,817,786.30 from the sale.[10] The trustee is asking for compensation on the $3,817,786.30, as well as 42 percent of the amount that REI paid to its secured creditor at closing.

In conjunction with this sale, according to the Final Report, the trustee distributed to Al Reid the sum of $59,408.90. And, while not necessarily related to the sale, the Final Report notes that on January 20, 1995, Albert Reid repaid the estate for a loan in the amount of $150,000.00. No other explanation for the loan is contained in the Final Report. The trustee seeks compensation for the distribution of those funds.

---

4. Doc. # 409, Ex. A.

5. *Id.*

6. *See* Doc. # 833 (Memorandum Opinion dated February 3, 2000).

7. Doc. # 409, Ex. A, ¶ 9, pg. 10.

8. Doc. # 448 (Order Authorizing Trustee to Vote Stock).

9. *Id.* at ¶ 31, pg. 5.

10. Tr. Ex. # 1, pg. 13.

In addition to the sales proceeds from the sale of Wilderness Safari Park, the trustee also sold several parcels of real estate that belonged to Ms. Reid, not to REI. In total, the trustee sold Ms. Reid's real estate for the sum of $412,860.00. Of that gross amount, the trustee satisfied liens to secured creditors that totaled $186,426.50. The trustee is asking for compensation on the net proceeds to the estate, as well as on the funds he either distributed, or directed to be distributed, to the secured creditors at closing.

On February 24, 1992, this Court entered judgment against Ms. Reid and in favor of REI. The judgment held Ms. Reid liable to REI for $201,500.00 in actual damages and $300,000.00 in punitive damages. As a result of this judgment, REI became an unsecured creditor of Ms. Reid's bankruptcy estate. At the same time Ms. Reid, and, thus, the bankruptcy estate, owned 50 percent of REI. After the Agreement, Ms. Reid, and, thus, the bankruptcy estate, owned 42 percent of REI. This is significant because as the trustee made distributions to REI in payment of the judgment, REI returned 42 percent to the estate. According to the Final Report, on November 1, 1993, the estate received from REI the sum of $120,023.95 as its 42 percent of the payments made to REI for actual and punitive damages.[11] Again, on December 14, 1993, the estate received from REI the sum of $21,000.00 as a payment on partial distribution.[12] On May 6, 1996, the estate received from REI the sum of $28,560.00 as a payment on partial distribution. In addition, on January 20, 1995, the Final Report noted a loan repayment from Albert Reid in the amount of $150,000.00.[13] It appears from the record that all of these receipts are recycled funds, although, the Final Report does not record a loan from the estate to Albert Reid, and there is no other explanation for the loan. One of the issues to be decided here is whether a trustee should receive a second commission on recycled funds such as the ones noted above.

Following the sale of Wilderness Safari Park, the trustee prepared income tax returns for the estate for 1993. The trustee attempted to deduct as a business expense the judgment obtained by Charles Trois that precipitated this bankruptcy filing.[14] The bankruptcy court disallowed the deduction, and on October 27, 1995, the estate paid a tax deficiency of $661,440.99 to the Internal Revenue Service (the IRS) as a result. The trustee then appealed that decision, which was reversed by the United States District Court for the Western District of Missouri. Finally, on September 3, 1999, after extensive litigation with the IRS, the estate received a refund in the amount of $732,716.70. In addition, the estate received the following tax refunds from either the IRS or the State of Missouri:

1. November 30, 1994   $49,213.86 [15]
2. December 6, 1996   25,446.94 [16]
3. May 23, 1997   1,065.30 [17]
4. March 25, 1998   201.00 [18]
5. December 11, 1998   18,853.33 [19]

As the UST points out in his Comment, the total of the funds received by the estate in the form of tax refunds totals $827,497.13. Once again, an issue exists as to whether the trustee is entitled to a commission on funds which pass through his account a second time.

11. *Id.* at pg. 15.

12. *Id.* at pg. 16.

13. *Id.* at pg. 20.

14. For a further explanation of this lawsuit, and its impact on this case, *see* Doc. # 833.

15. Tr. Ex. # 1 at pg. 19 (this is "agreed new money" per Court Order of August 9, 1993).

16. *Id.* at pg. 22.

17. *Id.* at pg. 23.

18. *Id.* at pg. 24.

19. *Id.* at pg. 25.

This Court held a hearing on June 7, 2000, on the trustee's Final Report and Final Application and the objections thereto. At the hearing the trustee argued that he is entitled to compensation for constructive disbursements, as well as recycled moneys, so long as the estate held an ownership interest in an operating enterprise. The UST filed a Comment drawing the Court's attention to a number of issues, as will be explained.

Ms. Reid's objections can be summarized as follows. She is generally unhappy with the way the bankruptcy estate was administered. She objected to the Agreement and to the sale of Wilderness Safari Park. She feels she has been treated unfairly by the trustee. She also points out that the trustee did make some errors in calculating his fees, and, even though the errors were later corrected, she argues that the errors should disqualify him from any further compensation. As I stated at the hearing on June 7, 2000, however, the trustee's action concerning the sale of the Park and the Agreement were all approved by the Court, and the Orders approving such actions have been final for many years. I will, therefore, focus primarily on the specific legal issues raised by the UST.

## DISCUSSION

Section 326(a) of the Bankruptcy Code (the Code) sets forth the formula for calculating a Chapter 7 trustee's compensation. The version of the section that was in effect on the date this case was filed provides:

> (a) In a case under Chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title for the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 15 percent on the first $1,000 or less, 6 percent on any amount in excess of $1,000 but not in

excess of $3,000, and three percent of any amount in excess of $3,000 upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including the holders of secured claims.[20]

At issue in this case is the interpretation of two phrases in this Code section. The trustee argues that the plain language of the statute, "all moneys disbursed or turned over in the case to parties in interest, excluding the debtor, but including the holders of secured claims," covers both the tax refunds and the disbursements to secured creditors. The UST, in essence, questions the trustee's distributions in the Final Report in the following five different categories: (1) payments to secured creditors on real estate owned by Ms. Reid on the date of filing; (2) payment of costs and satisfaction of the lien associated with the sale of Wilderness Safari Park; (3) payments to Al Reid; (4) payments to REI; and (5) compensation on funds returned to the estate through tax refunds. I will address each of these categories in turn.

### A. Real Estate Owned by Magdeline Reid

On the date of filing Ms. Reid owned, or this Court found that she owned, seven parcels of real estate with a combined fair market value of $412,860.00. The trustee was actively involved in discovering and marketing these properties, settling claims against them, and closing their sales. Secured liens against these parcels of real estate totaled $186,426.50, which were paid by the escrow agents at closing. The issue is whether those payments represent "moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including the holders of secured claims,"[21] even though the trustee did not himself write a check to those creditors. A number of cases cited by the UST deal with the issue of whether a trustee is

---

**20.** 11 U.S.C. § 326(a)(1990).

**21.** As required by 11 U.S.C. § 326(a) in order for the trustee to be compensated.

entitled to compensation for "constructive disbursements." The lineage of those cases can be traced back to *In re New England Fish Company*,[22] in which the trustee sought compensation not just for cash disbursements to creditors, but also for liens assumed and claims released in connection with sales of estate property. The Court found that such "constructive disbursements" do not represent "moneys disbursed or turned over in the case by the trustee."[23] Another more recent decision also held that lien assumptions cannot give rise to a trustee's commission.[24] Other Courts, by contrast, have allowed trustees to claim compensation for "constructive disbursements," where the trustee sold the property subject to a lien or where a creditor agreed to release its claim.[25] Those cases do not, however, deal with the precise issue here, which is whether moneys disbursed at the trustee's direction are considered to be "moneys disbursed or turned over by the trustee to parties in interest." I find that moneys can be disbursed by the trustee to creditors even though the trustee does not write the check or deliver an envelop with cash to such creditors. Buyers of real property may well be more comfortable, and more willing to buy, if the sale is closed through a third party, such as a title company or a real estate broker. That third party, who makes the actual disbursements to the secured creditor, does so pursuant to instructions from the trustee. In that situation, I find that disbursements are made "by" the trustee.

The potential for abuse in these situations is where the trustee sells property with minimal equity, and then tries to capture an inordinate share of that equity for

him or herself by claiming a commission on the entire sales price. Such was the case in *Indoor–Outdoor Dining, Inc.*,[26] where a trustee claimed a commission of 3 percent of a sales price of $830,241.00, when the estate netted only $59,793.00 from the sale.[27] As the Third Circuit recently pointed out, the issues are whether the trustee "justifiably administered" the asset, and whether the trustee is entitled to the maximum fee allowable under section 326(a).[28] In this long and complex case, I find that the trustee has marshaled assets located in other states, that he has sold those assets for the benefit of all of the creditors, that he has sold all of the assets for sums sufficient to satisfy the liens and enlarge the estate, and that he has actively participated in the sale of the assets. I find that, pursuant to section 326(a), the trustee has disbursed or turned over funds to parties in interest—secured creditors of Ms. Reid—and that he is entitled to his commission for those disbursements. I, therefore, find that the trustee will be allowed his compensatory fee on the disbursements he made to secured creditors of Ms. Reid, the total of such disbursements being $186,426.50.

**B. *Sale of Wilderness Safari Park***

■ The trustee argues he is entitled to compensation for the gross sales proceeds received by the estate from the sale of the Park. The estate netted $3,817,786.30 from the sale. The Final Report indicates that the estate received gross sales proceeds of $4,390,092.00, from which the trustee satisfied a lien and paid various other expenses of the sale. The trustee represented that he was an active participant in the sale, that he advertised the

---

**22.** 34 B.R. 899 (Bankr.W.D.Wash.1983).

**23.** *Id.* at 902.

**24.** *In re Barnett*, 133 B.R. 487, 488 (Bankr. N.D.Iowa 1991).

**25.** *See Southwestern Media, Inc. v. Rau*, 708 F.2d 419, 423 (9th Cir.1983) (as long as the sale included a release or satisfaction of the

lien as opposed to a sale subject to the lien); *In re Stanley*, 120 B.R. 409, 413 (Bankr. E.D.Tex.1990).

**26.** 77 B.R. 952 (Bankr.S.D.Fla.1987).

**27.** *Id.* at 953.

**28.** *In re Lan Associates XI L.P.*, 192 F.3d 109, 117 (3rd Cir.1999).

property, that he ultimately located the buyer, and that he participated in the closing. That may well be, but the estate did not own Wilderness Safari Park. REI did. REI, therefore, was the only entity that could sell the Park. And REI was the entity that was responsible for all of the expenses of the sale, including satisfying the mortgage prior to disbursing the proceeds. The estate held a 42 percent interest in the Park, and the estate was, therefore, entitled to 42 percent of the net proceeds of that sale. The trustee cannot claim credit for the disbursement of funds to a lienholder that was a creditor of REI, not the debtor. Judge See made it explicitly clear in her Order of April 9, 1993, that she was only authorizing the trustee to vote the estate's 42 percent ownership interest in REI in favor of a sale, not conduct a sale.[29] The Order states that the "objections to the Motion [to vote stock] are overruled because: (a) Section 363 of the Bankruptcy Code does not apply to the trustee's Motion since the Trustee is asking for the authority to vote stock and not to sell property of the bankruptcy estate."[30] Given such express language, it is clear that the estate did not sell the Park, nor could it have sold the Park. Since it did not own the Park, the estate was not responsible for satisfying the lien or any other costs of the sale. I will, therefore, reduce the base amount subject to the trustee's compensation by the sum of $572,305.70, the difference between what the trustee claims was the gross sales proceeds in the amount of $4,390,092.00, and the net gain to the estate in the amount of $3,817,786.30.

### C. *Payments to Al Reid*

■ The Final Report also records payments to Al Reid in conjunction with the sale of Wilderness Safari Park in the total amount of $59,408.90. Again, I point out that Al Reid was a 42 percent owner of REI, which owned Wilderness Safari Park. Any payments to Al Reid in conjunction with the sale had to come from REI out of the gross sales proceeds, not out of this bankruptcy estate. There is little documentation for the transfer of funds from the estate to Al Reid, but as long as REI was a solvent corporation, any service Al Reid performed for REI had to be satisfied by REI. In addition, on January 20, 1995, the Final Report noted a loan repayment from Albert Reid in the amount of $150,000.00.[31] Again the Final Report offers no explanation for this repayment, and I could find no record in the Final Report of a distribution from the estate of a loan in that amount. Be that as it may, any loan to Al Reid should have, and would have, been made by REI, not the estate of the Debtor. I will, therefore, reduce the base amount subject to the trustee's compensation by an additional sum of $209,-305.70.

### D. *Payments to REI*

■ This Court entered judgment against Ms. Reid and in favor of REI in February of 1992, and it assessed both actual and punitive damages against her. The judgment held Ms. Reid liable to REI for $201,500.00 in actual damages and $300,000.00 in punitive damages. REI then became an unsecured creditor of Ms. Reid's bankruptcy estate. After the Agreement, and the sale of Wilderness Safari Park, the estate began making distributions to REI in satisfaction of that judgment. However, Ms. Reid, and, thus, the bankruptcy estate, owned 42 percent of REI. Therefore, as the trustee made distributions to REI in payment of the judgment, REI returned 42 percent to the estate. According to the Final Report, on November 1, 1993, the estate received from REI the sum of $120,023.95 as its 42 percent of the payments made to REI for

---

**29.** Doc. # 448 (Order Authorizing Trustee to Vote Stock).

**30.** *Id.* at ¶ 31, pg. 5.

**31.** *Id.* at pg. 20.

actual and punitive damages.[32] Again, on December 14, 1993, the estate received from REI the sum of $21,000.00 as a payment on partial distribution.[33] On May 6, 1996, the estate received from REI the sum of $28,560.00 as a payment on partial distribution. All of these payments from REI to the estate are recycled moneys that conferred no additional benefit to the estate. Moreover, the trustee could have structured these payments to REI in order to prevent funds going out of the estate and then returning to the estate in order for the funds to then be redistributed. And, the trustee could have structured the payments in such a way that the estate did not become a creditor of REI's while awaiting the 42 percent reimbursement following a distribution. Since the trustee had control over the distribution of these funds, and since the trustee's actions necessitated redistribution of these funds, I will reduce the base amount subject to the trustee's compensation by the sum of $169,583.95.

### E. Tax Refunds

■ Over the course of this case the estate overpaid both state and federal taxes by the sum of $827,497.13. A large percentage of those overpayments occurred on October 27, 1995, when the estate paid a tax deficiency of $661,440.99 to the IRS pursuant to an Order of this Court. The trustee prepared income tax returns for the estate for 1993, and he claimed the judgment obtained by Charles Trois against Ms. Reid as a deductible business expense. Judge See disallowed the deduction and ordered the deficiency paid. The trustee then appealed that decision and prevailed. Finally, on September 3, 1999, after extensive litigation with the IRS, the estate received a refund in the amount of $732,716.70. In addition, the estate received the following tax refunds from either the IRS or the State of Missouri:

1. November 30, 1994   $49,213.86 [34]
2. December 6, 1996   25,446.94 [35]
3. May 23, 1997   1,065.30 [36]
4. March 25, 1998   201.00 [37]
5. December 11, 1998   18,853.33 [38]

The UST comments that the trustee is not entitled to compensation on recycled moneys. The UST, however, cited no case that so holds. And this Court was unable to find any precedent other than the plain language of section 326(a). That section limits the trustee's compensation to a percentage of all moneys disbursed to parties in interest.[39] The trustee had no choice but to file tax returns with the various taxing authorities, and pay the amount assessed. As noted, this is a very complex case, and the estate has generated a great deal of income. The trustee performed the work necessary to file the tax returns, and, in the case of the tax deficiency, to pursue the matter until he prevailed and obtained the refund. Moreover, the trustee's efforts in preparing and filing tax returns, and ultimately paying the assessed tax, benefitted the estate. The estate would have been subject to penalties and interest had the trustee not done so. It is not disputed that the funds at issue here were property of the estate, and that their administration required time and effort on the part of the trustee, whether recycled or not. In the absence of any other authority in this area, I will find that the plain language of section 326(a) does not prohibit this Court from allowing the trustee reasonable compensation on tax refunds that were then redistributed. I will, therefore, not reduce the base compensa-

---

**32.** *Id.* at pg. 15.

**33.** *Id.* at pg. 16.

**34.** Tr. Ex. # 1 at pg. 19 (this is "agreed new money" per Court Order of August 9, 1993).

**35.** *Id.* at pg. 22.

**36.** *Id.* at pg. 23.

**37.** *Id.* at pg. 24.

**38.** *Id.* at pg. 25.

**39.** 11 U.S.C. § 326(a).

tion by the amount of the tax refunds, especially in light of the fact that the trustee made the largest overpayment only after the Court ordered him to do so.

In summary, I find that the trustee's estimation of the base upon which his compensation should be calculated in the amount of $6,565,504.84 should be reduced by the following: (1) the sum of $572,305.70 (costs of sale of Wilderness Safari Park); (2) $209,305.70 (payments to Al Reid associated with the sale of Wilderness Safari Park and from Al Reid in the form of a loan repayment) and (3) $163,583.95 (payments from REI). The sum of these reductions is $945,195.35, and the correct base for determining the trustees compensation is $5,620,309.49. Based upon these reductions the trustee is entitled to maximum compensation as follows:

| 15% of: | $1000.00 = | $ 150.00 |
| 6% of: | $2000.00 = | $ 120.00 |
| 3% of Balance: | $5,617,309.49 = | $168,519.28 |
| **TOTAL** | | $168,789.28 |

The trustee has been compensated to date in the amount of $162,618.80, therefore, he is entitled to claim an additional $6,170.48 plus expenses in the amount of $1,007.83.

■ Finally, for the reasons stated, I find that the trustee in entitled to the maximum allowable compensation as reduced herein. The trustee was actively involved in discovering and marketing assets of the estate, as a result of which the estate realized significant funds. With the exception of a portion of the punitive damages awards, all claims have been paid in full. And, at least in part, as a result of the trustee's efforts, an income tax refund was received, allowing a sizable payment to Ms. Reid as well. I find, that, with the reductions in maximum compensation found herein, the trustee is entitled to an award of maximum compensation as calculated under the version of 11 U.S.C. § 326(a) in effect on the date this bankruptcy case was filed.

■ Lastly, I will address Ms. Reid's objection to the Final Application, which deals with attorney's fees. Ms. Reid claims that most of the attorney's fees sought were generated when the trustee was acting as trustee, and not as an attorney for the trustee. I agree. The Final Application contains two separate billing statements. The first statement covers the period from July 6, 1998, until November 1, 1998. That statement indicates that the attorney for the trustee spent 14.30 hours in preparing for and defending the IRS's attempt to appeal the tax litigation that resulted in the tax refund on September 3, 1999. Total compensation requested for that time is $2,145.00 in fees and $422.65 in expenses. Those fees and expenses are appropriate for the attorney for the trustee, and they will be allowed.

The remainder of the fees requested were generated from January 8, 2000, through January 24, 2000. The statement reflects 31.90 hours of attorney time spent in preparation for a hearing in this Court on the distribution scheme followed by the trustee, and preparations for filing the Final Report and preparing the case for closing. Compensation for that time will not be allowed as the issue in this case from January 8, 2000, until now has been about distributions and closing the case. I will, therefore, reduce the Final Application by the amount of $2,752.75. I will, however, allow the expenses in the amount of $1,175.04, as the expenses would be allowable as part of the trustee's compensation if not part of his attorney's fees.

To summarize, the trustee is allowed compensation as follows: trustee compensation in the amount of $6,170.48; trustee expenses in the amount of $1,007.83; attorney's fees in the amount of $2,145.00; and attorney expenses in the amount of $1,597.69. The total, and final, distribution to the trustee in this case, prior to closing the case is, thus, the sum of $10,921.00.

■ Finally, Ms. Reid has moved for sanctions against the trustee. As I stated at the hearing, the actions of the trustee to which Ms. Reid objects were taken pursuant to Court Orders. He submitted fee applications that were approved by the

522

Court. Any error in calculating trustee compensation has to be attributed to the complexity of the case and the diverse nature of the assets. I will, therefore, deny the motions for sanctions.

An Order in accordance with this Memorandum Opinion will be entered this date.