

**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE NINTH CIRCUIT

In re:                                  ) BAP No. HI-10-1468-PaDJu
                                        )
HOKULANI SQUARE, INC.,                  ) Bk. No. 07-00504
                                        )
                                        )
                Debtor.                 )
_____ )
                                        )
                                        )
UNITED STATES TRUSTEE,                   )
                                        )
                Appellant,              )
                                        )
v.                                      ) **O P I N I O N**
                                        )
BRADLEY R. TAMM, Chapter 7 Trustee,)
                                        )
                Appellee.               )
_____ )

Argued and submitted on September 22, 2011
by video conference

Filed - November 8, 2011

Appeal from the United States Bankruptcy Court
for the District of Hawaii

Hon. Robert J. Faris, U.S. Bankruptcy Judge, Presiding.

_____

Appearances:    Curtis B. Ching appeared for appellant U.S.
                Trustee.  Bradley R. Tamm appeared pro se.


Before: PAPPAS, DUNN and JURY, Bankruptcy Judges.

PAPPAS, Bankruptcy Judge:

The United States Trustee ("the UST") appeals the order of the bankruptcy court approving the application for final compensation and expenses of chapter 7[1] trustee Bradley B. Tamm ("Tamm"). In particular, the UST argues that, in calculating the maximum compensation that could be allowed under § 326(a) for Tamm's services in the bankruptcy case, the bankruptcy court erred when it included the amount of the credit bid made by secured creditors in connection with Tamm's sale of real property. We agree with the UST, and therefore REVERSE and REMAND.

**FACTS**

Hokulani Square, Inc. ("Debtor") filed a petition for relief under chapter 11 on May 10, 2007. Debtor's principal asset was a nineteen-unit condominium project (the "Property"). From the beginning of this bankruptcy case, it was clear that the Property was fully encumbered by mortgages held by secured creditors Investors Funding Corporation and Walter and Sylvia Chang (together, the "Secured Creditors").

After two years of alleged mismanagement of its business in the chapter 11 case by the Debtor, on March 30, 2009, the Secured Creditors filed a motion to convert the bankruptcy case to chapter 7, or for the appointment of a chapter 11 trustee. Although the bankruptcy court initially granted the motion and converted the

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. Section numbers less than 100 refer to the Bankruptcy Act, 11 U.S.C. § 1 et seq. (repealed 1978). All "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

case to chapter 7, the UST was unable to entice any of the local chapter 7 panel trustees to serve in the case. As a result, the bankruptcy court vacated the conversion order and, instead, directed appointment of a chapter 11 trustee. Tamm was appointed chapter 11 trustee.

Tamm promptly determined that there was no reasonable likelihood of rehabilitating the Debtor's financial affairs under chapter 11 and, on May 26, 2009, moved to again convert the case to chapter 7. The bankruptcy court immediately granted Tamm's request and converted the case. Tamm was then appointed by the UST to serve as chapter 7 trustee.

Tamm experienced considerable pressure to dispose of the Property. Apparently, a "Condominium Public Report" issued by the Hawaii State Department of Commerce and Consumer Affairs, the conditions of which would govern any sale of the Property, was scheduled to expire on August 15, 2009, and Tamm had determined that any attempt to extend the authorized sale date would result in a substantial expense to the bankruptcy estate. Tamm therefore entered negotiations with the Secured Creditors to sell the Property to them. A deal was struck whereby the Secured Creditors agreed to purchase the Property by submitting a credit bid totaling $1,500,000, as authorized by § 363(k).[2] However, the

---

[2] Section 363(k) provides:

Use, sale, or lease of property

(k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase
(continued...)

-3-

Secured Creditors agreed with Tamm's request that their credit bid would be subject to an opportunity for others to submit higher bids for the Property.

Tamm filed a motion in the bankruptcy court on July 10, 2009, to approve the sale of the Property, free and clear of liens or other interests, pursuant to §§ 363(f) and (m). The bankruptcy court conducted a hearing on Tamm's motion on August 3, 2009. No higher bids were submitted under the process set forth in Tamm's motion.[3] The bankruptcy court therefore entered an order the same day approving the sale of the Property to the Secured Creditors, or their designees, for $1,500,000, with the purchase price to be paid by the credit bids of the Secured Creditors. The sale was closed on August 18, 2009. As Tamm had agreed with the Secured Creditors, title to the Property was conveyed at closing to their nominees, SJB Kalihi One, LLC, SJB Kalihi Two, LLC, and MSP, LLC (the "Purchasing Entities"). Per the escrow instructions, the sale was effected by offsetting a credit against amounts owed on the existing mortgages to the Secured Creditors against the sale price. Report of Sale at dkt. no. 501.

Tamm completed administration of the bankruptcy estate and submitted his Final Report on July 1, 2010. In the Final Report, Tamm represented that he had made, or would make from funds on

---

[2](...continued)
price of such property.

[3] The balance owed to the Secured Creditors was at least $2.2 million. Presumably, if an overbid was submitted and if they chose to do so, the Secured Creditors could have simply upped their credit bid. Considering the history of difficulties in marketing the Property, it seems highly unlikely that, under these sale terms, the Property would have been acquired by any party other than the Secured Creditors.

-4-

hand, a total of $2,720,000 in disbursements to creditors in the bankruptcy case. Of course, that amount included the credit bid made by the Secured Creditors for the purchase of the Property, which Tamm entered in the Final Report as an offset against the Secured Creditors' claims secured by the Property.

In his request for compensation and expenses accompanying the Final Report, Tamm requested $109,293 in compensation for his services, the maximum he alleged was available to him under the "caps" established in § 326(a).[4] Again, this calculation was based upon the $2,720,000 Tamm alleged he was "disbursing" to creditors, which in turn included the Secured Creditors' credit bid at the sale.

The UST objected to Tamm's fee application. The UST's sole objection was that, because the amount that Tamm alleged he had disbursed improperly included the $1,500,000 credit bid for the sale of the Property, Tamm's compensation request exceeded the maximum allowed for a trustee under § 326(a). In its objection, the UST argued that the Secured Creditors' credit bid was not "moneys disbursed" for purposes of § 326(a) in calculating the

---

[4] Section 326(a) provides:

Limitation on compensation of trustee

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $ 5,000 or less, 10 percent on any amount in excess of $ 5,000 but not in excess of $ 50,000, 5 percent on any amount in excess of $ 50,000 but not in excess of $ 1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $ 1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

trustee's maximum compensation.[5]

In Tamm's response to the UST's objection, he discussed what he believed was the extraordinary complexity of the bankruptcy case, detailed his many efforts in administering the case, and suggested that the results he had obtained had exceeded the expectations of either the UST or the bankruptcy court. On the legal issue raised by the UST's objection to his fee request, Tamm argued that Ninth Circuit case law allowed him to include the amount of the Secured Creditors' credit bid in the sale of the Property in computing his maximum compensation.

At the hearing on Tamm's Final Report and request for compensation, the bankruptcy court began by repeating the conclusions expressed in a pre-hearing tentative ruling: "My view is that the Ninth Circuit would hold that credit bids should be treated as moneys disbursed [for purposes of § 326(a)]. And my main reason for coming to that conclusion is it makes the substance consistent with the form." After acknowledging that Tamm had done a creditable job in a difficult case, the UST nevertheless argued that the Bankruptcy Code and case law simply did not allow credit bids to be included in computing a trustee's compensation. Tamm, of course, disagreed.

After hearing the parties' arguments, the bankruptcy court approved the full amount requested by Tamm in his fee application. In doing so, however, the court acknowledged that the case law on

---

[5] Section 330(a)(1)(A) provides that, "subject to [§ 326 and other provisions], the court may award a trustee . . . reasonable compensation for actual, necessary services rendered by the trustee . . . ." The UST did not argue that the amount requested by Tamm for compensation was unreasonable.

including credit bids in calculating chapter 7 trustee compensation was unsettled: "The clearest authority goes against me. It's from outside the circuit. I think that the Court of Appeals for this circuit would probably stick with [the Ninth Circuit cases decided under the Bankruptcy Act], but maybe we'll see." Tr. Hr'g 16:14-17, November 10, 2010.

The bankruptcy court entered an order approving Tamm's Final Report and application for compensation on November 12, 2010. The UST filed a timely notice of appeal.

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334 and 157(b)(2)(A). The Panel has jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Did the bankruptcy court err in including the amount of the credit bid as "moneys disbursed" under § 326(a) in calculating the maximum allowed for chapter 7 trustee compensation?

**STANDARD OF REVIEW**

We review the bankruptcy court's construction of the Bankruptcy Code de novo. Educ. Credit Mgmt. Corp. v. Mason (In re Mason), 464 F.3d 878, 881 (9th Cir. 2008); W. States Glass Corp. v. Barris (In re Bay Area Glass, Inc.), 454 B.R. 86, 88 (9th Cir. BAP 2011).

**DISCUSSION**

I.

The parties agree that the outcome of this dispute is controlled by the construction of § 326(a). However, there is a marked difference in how they frame the precise issue for decision

-7-

by the Panel. The UST casts the issue on appeal as:

> When a secured creditor purchases its collateral from the estate, it may "credit bid" and offset the liability under the sales agreement against its secured claim under § 363(k). The question presented is whether the amount offset from a sales price because of a credit bid constitutes "money disbursed" by a chapter 7 trustee to a secured creditor under § 326(a).

UST Op. Br. at 1. In contrast, according to Tamm,

> [t]he proper issue is whether, when a bankruptcy trustee sells estate property to a third party free and clear of liens, the amounts of the liens constitute "moneys disbursed" for purposes of calculating the trustee's fees pursuant to § 326(a). In particular, Tamm notes that he "did not sell the Estate Property to the Secured Creditors."

Tamm Br. at 1.

As can be seen, presumably for strategic reasons, Tamm attempts to distinguish the sale of the Property that occurred in this bankruptcy case from the usual transaction wherein a secured creditor employs a credit bid under § 363(k) to purchase its collateral at a trustee's sale. In this case, Tamm points to the facts and insists that the Property was actually sold to non-creditor third parties. In doing so, Tamm attempts to align his position with the facts presented to the Ninth Circuit in Sw. Media, Inc. v. Rau, 708 F.2d 419 (9th Cir. 1983), considered in detail below.

We disagree with Tamm's characterization of the sale. No doubt, the sale closing documents show that the Property was conveyed to the Purchasing Entities, and not to the Secured Creditors. However, as Tamm conceded at oral argument, as authorized in Tamm's sale motion, the Purchasing Entities were the designees of the Secured Creditors to receive title to the Property. Indeed, it appears that the Purchasing Entities had not

-8-

even been legally formed until after Tamm's sale motion was submitted to the bankruptcy court.[6] In that motion, Tamm had represented to the bankruptcy court that "[a]ny potential designee by the Secured Creditors has also been disclosed to the Trustee and the Trustee has been assured that they will be third parties not related to the Debtor and not insiders of the Debtor." Tamm's Br. at 2 (emphasis added). This representation is found in a portion of Tamm's motion subtitled, "The Secured Creditors are Good Faith Purchasers and are Entitled to the Protections of 11 U.S.C. § 363(m)." Tamm did not in the sale motion, or at any time thereafter in the bankruptcy case, refer to the Purchasing Entities as "third parties."

More importantly, after the sale Tamm referred to the Secured Creditors as the purchasers of the Property via their credit bid. In particular, barely one month after the sale was approved by the bankruptcy court, on September 29, 2009, Tamm and all three of the Secured Creditors executed and filed a Settlement Agreement in the case in which the Secured Creditors agreed with Tamm to dismiss their pending adversary proceedings against the bankruptcy estate related to the Property, and instead to assert their rights through the claims process. In the parties' settlement agreement, they recite that "On August 14, 2009, pursuant to an order filed in the Case, the Secured Creditors acquired by credit bid the Estate's then remaining interest in the [] Property." Settlement Agreement, Paragraph J, at dkt. no. 510.

---

[6] In response to questions from the Panel at oral argument, Tamm was unaware whether the Purchasing Entities were created or controlled by the Secured Creditors.

-9-

Because we think it is disingenuous, we decline Tamm's invitation to recast the facts here to characterize his sale of the Property to "third parties," and not to the Secured Creditors. The UST's formulation of the issue on appeal, whether the amount offset from a sales price as the result of a secured creditor's credit bid constitutes "money disbursed" by a chapter 7 trustee to a secured creditor under § 326(a), is the correct one.

## II.

We next highlight a matter that is not before the Panel. Throughout Tamm's arguments in the bankruptcy court, and now on appeal, a common theme emerges: that Tamm performed his duties as chapter 7 trustee in a commendable, competent, even extraordinarily effective fashion, under extremely difficult circumstances. See Tamm's Op. Br. at pp. 3-5, 23-25. However, the UST has never disputed Tamm's suggestion that, based upon the services he performed, the amount of compensation he requested and was awarded by the bankruptcy court was "reasonable" as required by § 330(a). Accordingly, the Panel presumes that, if the amount of Tamm's compensation request does not exceed the statutory cap, it is otherwise proper.

On the other hand, to the extent that Tamm suggests that the bankruptcy court, or this Panel, should engage in equitable considerations in construing § 326(a) based upon the quantity and quality of Tamm's services, Tamm is incorrect. It was the charge of the bankruptcy court, and now this Panel, solely to interpret the Code, and not to determine, as Tamm asks, whether the bankruptcy estate was "justifiably administered." Tamm's Op. Br. at 12, 25. Although a bankruptcy court has broad discretion in

-10-

determining reasonable compensation, it has no discretion to award an amount exceeding § 326(a)'s cap, based on equitable or any other grounds. As the Ninth Circuit has explained, "Congress, not the judiciary, must make any necessary changes in the system of trustee compensation created by the Bankruptcy Code." Boldt v. U.S. Tr. (In re Jenkins), 130 F.3d 1335, 1341 (9th Cir. 1997); see also Gill v. von Wittenberg (In re Fin. Corp. of Am.), 114 B.R. 221, 224 (9th Cir. BAP 1990) ("The maximum fee set by § 326(a) has no correlation with fair value for services."), aff'd and adopted sub nom. Tiffany v. Gill (In re Fin. Corp. of Am.), 946 F.2d 689, 690 (9th Cir. 1991). Any judicial attempt to relax the § 326(a) caps based on notions of fairness or equity would undermine Congress's intent to cap trustee fees under section 326(a). In re Jenkins, 130 F.3d at 1341.

In this case, the bankruptcy court properly rejected Tamm's arguments that "the equities" should be considered in determining his compensation:

> The only real question is what the words "moneys disbursed" mean in [§ 326(a)], and I think the meaning of the words money disbursed is the same if the Trustee did a good job or did a terrible job, or if it was a hard case or an easy case. That's why I say the circumstance[s] aren't relevant.

Tr. Hr'g 15:14-18. We agree with the bankruptcy court and the UST that the only issue in this dispute is whether the Secured Creditors' credit bids constitute "moneys disbursed" for purposes of § 326(a).

III.

Although the bankruptcy court's focus was the proper one, we disagree with its interpretation of § 326(a), which it summarized

-11-

at the hearing:

> It seems to me that money comes in lots of different forms and disbursements can be made in lots of different ways. And here we have what I think is disbursement of money in the form of credit being given against a secured obligation. I mean money can be disbursed by handing a pile of cash to somebody, by handing a check to somebody, by making electronic transfer, and can also be made by essentially bookkeeping entries, and that's basically what a credit bid is. So to me a credit bid is money disbursed.

Tr. Hr'g 15:19—16:2.[7] For the several reasons discussed below, we are constrained to reverse the bankruptcy court's decision.

A.

Of course, construing the Code begins with the plain meaning of its language. United States v. Ron Pair Enters., 489 U.S. 235, 241 (1989). "Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership, 507 U.S. 380, 388 (1993) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)).

Where a term is defined within the statute, that definition controls its interpretation. Colautti v. Franklin, 439 U.S. 379, 392 (1979). But, in this case, the Bankruptcy Code does not define either "money" or "moneys disbursed." In the absence of a statutory definition, "we construe a statutory term in accordance

---

[7] If the bankruptcy court's characterization were correct, it would seem that the credit bid was more properly viewed as part of the consideration received by the trustee for the sale of the Property, rather than something the trustee disbursed to the Secured Creditors. Since we conclude below that a credit bid is not "moneys disbursed," this a matter of no consequence in this appeal.

-12-

with its ordinary or natural meaning." FDIC v. Meyer, 510 U.S. 471, 476 (1994). A court "may follow the common practice of consulting dictionaries to determine how the terms were defined at the time the statute was adopted." Stanford v. MemberWorks, Inc., 625 F.3d 550, 559 (9th Cir. 2010); see also Ransom v. FIA Card Servs., N.A., 131 S.Ct. 716, 724 (2010) (consulting, in a recent bankruptcy case, both Webster's Third New International Dictionary ("Webster's") and the Oxford English Dictionary ("OED") for the ordinary meaning of "applicable.").

The OED defines money: "[a]ny generally accepted medium of exchange which enables a society to trade goods without the need for barter; any objects or tokens regarded as a store of value and used as a medium of exchange. a. Coins and banknotes collectively as a medium of exchange." (3d ed. online, 2002). Webster's defines it as "something generally accepted as a medium of exchange, measure of value or a means of payment." Webster's 1458 (2002). Black's Law Dictionary states that money is "[t]he medium of exchange authorized or adopted by a government as part of its currency." Black's Law Dictionary 1096 (9th ed. 2009). As can be seen, the common element in all these definitions is the notion that money is a "medium of exchange."[8]

That phrase, in turn, has an ordinary and plain meaning in the principal dictionaries. A medium of exchange is "something

---

[8] Although the Uniform Commercial Code is not a dictionary, it provides a similar definition of the terms for its purposes: "'Money' means a medium of exchange currently authorized or adopted by a domestic or foreign government. The term includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more countries." U.C.C. § 1-201(24)(2011).

-13-

commonly accepted in exchange for goods and services and recognized as representing a standard of value." Webster's 1403 (2002). The OED delves deeper, noting that a medium of exchange is "anything commonly agreed as a token of value and used in transactions in a trading system; esp. freely circulating units of money, as banknotes, coins, which fulfill this role; currency." OED (Online, 3d ed., 2001).[9]

The term "disbursement" also has an accepted dictionary definition. It means to "pay out or expend money." OED (Online, 3d ed. 2002); accord, Webster's 644 (2002); Black's Law Dictionary 1096 (9th ed. 2009) (to "disburse" is "[t]he act of paying out money[.]").

Thus, according to the dictionaries, money is a medium of exchange "commonly accepted in exchange for goods and services" or "used in transactions in a trading system." A disbursement occurs

---

[9] The Supreme Court's description of "medium of exchange" in Legal Tender Cases, 79 U.S. 457 (1870), reflects the traditional view that "money" is defined as a medium of exchange and must be cash, currency or its equivalent. "All writers upon political economy agree that money is the universal standard of value, and the measure of exchange, foreign and domestic . . . . all admit that a commodity to serve as a standard of value and a medium of exchange must be easily divisible into small portions; that it must admit of being kept for an indefinite period without deteriorating; that it must possess great value in small bulk, and be capable of being easily transported from place to place[.]" Id. at 604-05. And although the Nineteenth Century Supreme Court could not have envisioned modern forms of currency and electronic accounting systems, the general principle remains intact: to be a medium of exchange, money has to be divisible, stable as a reference of value, and transportable (physically or electronically). See In re Oakley, 344 F.3d 709, 714 (7th Cir. 2003) ("[M]oney in whatever form — whether cash or an invisible, a disembodied, financial asset — is a medium of exchange rather than a useful good (with the irrelevant exception of money that has become a collector's item)"). Obviously, a secured creditor's credit bid made at a trustee's sale possesses none of the characteristics of a medium of exchange.

-14-

when money is paid out.

In our view, the Secured Creditors' credit bid submitted to Tamm in connection with the bankruptcy sale in this case falls outside the common dictionary meaning of "moneys disbursed." Tamm has not shown how a credit bid is commonly accepted as a medium of exchange for the purchase and sale of goods or services, nor that a credit bid is commonly used in transactions in a trading system. Fairly understood, in this context, a secured creditor's credit bid is strictly a creature of the Bankruptcy Code, having a single application, as an offset against the purchase price for property of a bankruptcy estate being sold by a trustee under § 363(k). By no reasonable interpretation can a credit bid be commonly accepted as a medium of exchange.

As explained by the dictionaries, in employing the term "moneys disbursed" in connection with capping trustee compensation, § 326(a) refers to the payment by a trustee to creditors of some form of a medium of exchange that is commonly accepted in exchanges and commercial transactions — in other words, cash, currency or its equivalent. In this context, we believe the ordinary and natural meaning of "moneys disbursed" would not include the Secured Creditors' credit bid.

B.

Although the Ninth Circuit has not directly addressed the meaning of "moneys disbursed" in § 326(a), our construction of the Code here is consistent with the only two decisions by courts of appeals to have considered this issue. See Staiano v. Cain (In re Lan Assocs. XI, LP), 192 F.3d 109, 118 (3d Cir. 1999); U.S. Tr. v. Pritchard (In re England), 153 F.3d 232, 235 (5th Cir. 1998).

-15-

The Lan Assocs. decision is closely on point with the facts of this case. The fee applicant was the trustee, appointed in a chapter 11 case, who continued to serve after the case was converted to chapter 7. He appealed a district court order reversing a bankruptcy court award of his fees. In calculating the trustee's maximum fee under § 326(a), the bankruptcy court had included the amount of a credit bid made by a mortgagee, pursuant to § 363(k), in a sale to the secured creditor to purchase its collateral. The district court reversed the fee award, stating that "the value of a credit bid portion of a § 363(b) sale is not 'moneys disbursed or turned over . . . to a party in interest,' and cannot be used to calculate the maximum allowable amount of trustee compensation." U.S. Tr. v. Cain (In re Lan Assocs. XI, LP), 237 B.R. 49, 56 (D.N.J. 1998).

The Third Circuit affirmed the district court's conclusion that the credit bid must be excluded in computing the trustee's compensation. In re Lan Assocs. XI, LP, 192 F.3d at 109. The court quoted legislative history to § 326(a):

> It should be noted that the base on which the maximum fee is computed includes moneys turned over to secured creditors, to cover the situation where the trustee liquidates property subject to a lien and distributes the proceeds. It does not cover cases in which the trustee simply turns over the property to the secured creditor, nor where the trustee abandons the property and the secured creditor is permitted to foreclose.

S. Rep. No. 95-989, 95th Cong. 2d Sess. 37-38 (1978); H.R. Rep. No. 95-595, 95th Cong., 1st Sess 327 (1977), reprinted 1978 U.S.C.C.A.N. 5963, 6283-84 (emphasis added). Id. at 116-17. The court observed that, as shown by the legislative history to § 326(a), the primary duty imposed by § 704(a)(1) on a chapter 7

-16-

trustee is to reduce property to money, such that "Congress intended to distinguish between the concepts of property and money. . . . The emphasis on 'moneys,' rather than property or value, accords with the drafter's understanding that 'the trustee's principal duty is to collect and reduce to money property of the estate for which he serves.'" Id. at 117(quoting H.R. Rep. No. 95-595, at 379 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6335). Based on its analysis, the Third Circuit concluded that Congress intended moneys disbursed in § 326(a) to be construed in its narrow sense, as "something generally accepted as a medium of exchange," consistent with the definition given in Webster's. In re Lan Assocs. XI, LP, 192 F.3d at 119.

In addition to courts within the Third Circuit, other courts have recently chosen to follow the reasoning in Lan Assocs. See In re Am. Canadian Invests., Inc., 353 B.R. 853, 856 (Bankr. E.D. Va. 2006) (relying on Lan Assocs., the bankruptcy court concluded that "it is quite clear that Congress intended for 'moneys disbursed' to mean actual money, not property, turned over by the trustee to secured creditors."); In re Circle Invests., Inc., 2008 WL 910062 *3 (Bankr. S.D. Tex. 2008) (citing Lan Assocs. for its conclusion that "a trustee's compensation must be based only on moneys actually disbursed or turned over to parties in interest, not on constructive disbursements").

In the other circuit-level case, In re England, the Fifth Circuit reversed a district court's order that had, in turn, reversed the bankruptcy court's order reducing a trustee's compensation because the trustee had included a credit bid

-17-

transaction in the fee computation. The court decided that the bankruptcy court's ruling was correct and that only moneys disbursed, not other property, could be included in calculating trustee's fees. However, in contrast to the Third Circuit's discussion of the legal issue, the Fifth Circuit avoided legislative history and instead relied on the plain meaning of the Code provision as evidenced in the dictionary definitions:

> Because the Bankruptcy Code does not define "moneys" (or "money"), we must rely upon the word's common everyday meaning, which does not include property. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1458 (Philip Babcock Gove ed., 1963) (defining "money" as "something generally accepted as a medium of exchange, a measure of value, or a means of payment"); BLACK'S LAW DICTIONARY 1005 (6th ed. 1990) (defining "money" as "coins and paper currency used as circulating medium of exchange, and does not embrace notes, bonds, evidences of debt, or other personal or real estate"). The plain language of § 326(a) indicates that the statute caps a trustee's compensation based upon only the moneys disbursed, without any allowance for the property disbursed.

In re England, 153 F.3d at 235.

In sum, our plain meaning analysis of moneys disbursed is consistent with the only two published circuit-level decisions analyzing the phrase.

C.

In addition to the plain meaning given to a term in dictionaries, the Supreme Court counsels that the meaning assigned to terms in the Bankruptcy Code should also reflect the statutory context, including the use of the subject term elsewhere in the Bankruptcy Code or related laws. Ransom, 131 S.Ct. at 724. Our research shows that the word "money" as used in other provisions of the Bankruptcy Code, and in other related statutes, almost always refers to cash, currency or its equivalent.

-18-

Significantly, in § 704(a)(1), one of the fundamental duties of a chapter 7 trustee is to "collect and reduce to money the property of the estate." As can be seen, in this provision, Congress clearly creates a distinction between "money" and other kinds of property.[10] We know of no decisions construing this statute other than as a reference to cash, currency or its equivalent.

In the case law, the courts have used the terms "money" and "cash" as synonymous in applying § 704(a)(1). See Gordon v. Hines (In re Hines), 147 F.3d 1185, 1189 (9th Cir. 1998) ("Section 704(1) directs a Chapter 7 trustee to collect and reduce to money the property of the estate . . . . There is no requirement that in acting pursuant to that statutory directive the trustee must obtain court approval before reducing the estate property to cash."); In re Murdock Mach. & Eng'g Co., 990 F.2d 567, 571 (7th Cir. 1993) (describing the trustee's primary responsibility under § 704(a)(1) to "obtain, reduce to cash, and distribute all of the estate's assets"); Hyman v. Plotkin (In re Hyman), 967 F.2d 1316, 1320 (9th Cir. 1992) (noting that "[a trustee's] obligation under 11 U.S.C. § 704(1) [is] to act in 'the best interest of parties in interest' in reducing estate property to cash."); Zupansic v. Hyman (In re Zupansic), 259 B.R. 388, 390 (M.D. Fla. 2001) ("[A]

---

[10] The legislative history to § 704 indicates that, in imposing the duty on the trustee to reduce property to money, Congress intended to distinguish between the concepts of property and money. See U.S. Tr. v. Messer (In re Pink Cadillac Assocs.), 1997 WL 164282 at *3 (S.D.N.Y. Apr. 8, 1997) ("The emphasis on 'moneys,' in § 704 rather than property or value, accords with the drafter's understanding that 'the trustee's principal duty is to collect and reduce to money property of the estate for which he serves.'" (quoting H.R. Rep. No. 95-595, at 379 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6335).

-19-

trustee has a duty to attempt to collect and reduce the property to cash for the benefit of creditors, consistent with the trustee's duties pursuant to 11 U.S.C. § 704(1)."); In re Shepherd, 12 B.R. 151, 153 (E.D. Pa. 1981) ("The trustee's obligation is to collect the assets, reduce them to cash, and distribute the cash pro rata among unsecured creditors."); In re Plunkett, 60 B.R. 290, 292 (Bankr. S.D.N.Y. 1986) ("It is the Trustee's duty to collect the estate and reduce it to cash for the purpose of paying dividends to creditors. Code §§ 704 and 726."); In re Di Gate Ready-Mix Corp., 55 B.R. 116, 117 (Bankr. E.D.N.Y. 1985) ("11 U.S.C. § 704(1) requires that the trustee of a bankruptcy estate collect and reduce to cash the property of the estate."); In re Ferris, 30 B.R. 746, 749 (Bankr. N.D. Ohio 1983) (Trustee's primary duty is to "reduce to cash" assets.); In re Carpenter, 23 B.R. 318, 319 (Bankr. D.N.J. 1982) (same); In re Wilson, 4 B.R. 605, 606 (Bankr. E.D. Wash. 1980) (same).

There are other examples in the Bankruptcy Code where Congress has used the term "money" as a manifest reference to cash, currency or the equivalent. For example, § 345(a) commands a trustee to deposit and invest "money of the estate" so as to achieve "the maximum reasonable net return on such money." By its terms, money in § 345(a) can only be interpreted as cash or currency, because only money as cash or currency can be deposited or invested. Moreover, a trustee may be liable to the estate when he or she does not invest or deposit moneys in interest-bearing accounts or use funds for an income-producing investment. U.S. Tr. v. Columbia Gas Sys. (In re Columbia Gas Sys.), 33 F.3d 294, 301 (3d Cir. 1994); see also In re Moon, 258 B.R. 828 (Bankr. N.D.

-20-

Fla. 2001)(trustee liable for difference between interest that could have been earned from certificates of deposit and interest actually earned in money-market account).

Other textual clues to the Code's meaning of "money" abound. Section 347(b) distinguishes money from securities and "other property" in the distribution of unclaimed property. Section 748(a) instructs that a trustee "reduce to money" any securities held as property of an estate. In a commodity broker liquidation under § 766(f), the trustee "shall reduce to money . . . all securities and other property . . . held as property of the estate." And while not part of the Bankruptcy Code, 28 U.S.C. § 1930(a)(6), the statute governing the amount of quarterly fees payable to the U.S. Trustee in chapter 11 cases, bases that computation on the cash (dollar) amounts of "disbursements" made by the debtor or trustee.

Based upon how the terms money and disbursement are used in the Code and related statutes, we do not think Congress intended that "moneys disbursed" in § 326(a) would include the Secured Creditors' credit bid.

D.

Of course, the plain meaning of a a Code provision will not control if such a construction yields an absurd result. Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004). On the other hand, even if the plain meaning of terms employed in the Code by Congress fosters harsh results, "courts may not soften the import of Congress's chosen words." Id. at 538.

Apparently, the bankruptcy court was concerned that the UST's construction of § 326(a) could lead to absurd results. In

-21-

explaining its interpretation of the Code, the court worried that: "If credit bids weren't treated as moneys disbursed, then Trustees would simply insist that potential credit bidders hand them a check. . . and the Trustee would then hand it right back to the creditor." Rather than "force people to go through that little ritual," the court ruled that it was appropriate to "make the substance consistent with the form." Tr. Hr'g 3:7-9. While the bankruptcy court's observations about the shortcomings of Congress' approach in calculating maximum trustee compensation might have merit, excluding a secured creditor's credit bids at bankruptcy sales from the meaning of "moneys disbursed" in § 326(a) is not absurd.

While the UST's interpretation of § 326(a) will significantly reduce Tamm's compensation in this case, he would still presumably receive approximately $70,000 for his services. And as noted above, "absurdity" does not necessarily result from a harsh outcome. Lamie, 540 U.S. at 538; Nixon v. Mo. Mun. League, 541 U.S. 125, 141 (2004) (Scalia, J., concurring) ("The avoidance of unhappy consequences is not an adequate basis for interpreting a text.").

As in this case, in adopting a "moneys disbursed" standard for capping trustee fees in § 326(a), Congress perhaps concluded that it was inappropriate to compensate trustees for selling estate property to the secured creditors holding liens on that property, where no cash changes hands, and the results of the transaction provide no quantifiable return to the estate or additional disbursements to unsecured creditors. Indeed, the effect of adopting Tamm's interpretation of § 326(a) here is to

compensate him for selling the Property to the Secured Creditors for no net return to the estate, with the payment of his enhanced fees from monies that would otherwise be distributed to unsecured creditors.[11] While the means Congress selected of implementing its policy, under these facts, may seem harsh to Tamm, or even flawed to the bankruptcy court, it cannot be said that excluding credit bids from the formula for calculating trustee fees is absurd.

IV.

Tamm insists that the Ninth Circuit's decisions in York Int'l Building, Inc. v. Chaney (In re York), 527 F.2d 1061 (9th Cir. 1976), and Sw. Media, Inc. v. Rau, 708 F.2d 419 (9th Cir. 1983), compel us to include the amount of the Secured Creditors' credit bids as "moneys disbursed" under § 326(a). The UST is equally vociferous that those decisions are neither precedential, nor particularly relevant, in resolving this appeal.

As noted above, the bankruptcy court did not suggest that these two Ninth Circuit decisions were binding precedent. Indeed, the bankruptcy court noted that York and Rau were decided "under the [Bankruptcy] Act and arguably distinguishable and perhaps not as thoroughly reasoned as one would hope." Tr. Hr'g 3:10-15. On the other hand, the court acknowledged that the only two circuit-

---

[11] Of course, had another bidder appeared at the trustee's sale and purchased the Property for cash, thereby generating even a small net return to the estate, Tamm could have included the amounts paid to the Secured Creditors out of the closing to satisfy their liens in computing his maximum compensation, because § 326(a) expressly contemplates that result. If such a sale resulted in increased compensation to Tamm out of proportion to the amount of the net return to the estate, the bankruptcy court, in the exercise of its discretion, could instead award Tamm a reasonable amount under § 330(a).

-23-

level decisions construing § 326(a), <u>Lan Assocs.</u> and <u>England</u> (discussed <u>supra</u>), are "the clearest authority that goes against me." Tr. Hr'g 16:14. Nevertheless, the bankruptcy court looked to the Ninth Circuit's decisions interpreting former law for an indication of where this issue "would come out" if it were to decide the question on appeal. Tr. Hr'g 3:14.

Obviously, we agree with the bankruptcy court that <u>York</u> and <u>Sw Media</u> are not binding precedent in this case. However, we respectfully disagree with the court that the two decisions are even persuasive in predicting the Ninth Circuit's views concerning this issue. Instead, we find the decisions are clearly distinguishable.

While both of the cited cases were decided under the former Bankruptcy Act, not the modern Bankruptcy Code, we acknowledge the a longstanding principle of construction of bankruptcy statutes that "we will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." <u>Pa. Pub. Welfare Dep't v. Davenport</u>, 495 U.S. 552, 563 (1990). However, in adopting § 326(a), Congress did clearly depart from the Bankruptcy Act's method of calculating trustee compensation. In addition, neither <u>York</u> nor <u>Rau</u> dealt with whether credit bids should be included in "moneys disbursed" by the trustee for purposes of computing maximum fees, the issue in this appeal.

In <u>York</u>, the Ninth Circuit reviewed the amount of reasonable compensation payable for a trustee's services in a chapter X case under the Bankruptcy Act. <u>York</u>, 527 F.2d at 1069. In that case, the trustee in reorganization, Mr. Chaney, sold the debtor's

-24-

property, and the sale was approved by the district court. Id. at 1074. But Chaney's compensation as trustee of the sale was not the focus of the disputes. Instead, the court's principal concern was the reasonableness of the compensation Chaney was seeking for services rendered while wearing his three other hats: At the time of the property sale, he was also functioning as manager of the building, owner of the company providing janitorial services to the building, and the broker who arranged the sale and was seeking a broker's commission.

In its discussion of Chaney's compensation as trustee, in a footnote, the Ninth Circuit allowed as a disbursement a purchaser's assumption of the existing mortgages on the property.[12] Tamm seizes on this footnote as proof that, "[T]he Ninth Circuit made a decision that a purchaser's assumption of an existing mortgage is a disbursement and therefore 'the total sales price of the property' should be included in the total disbursements. . . . The Ninth Circuit clearly and unequivocally held that in a sale subject to an existing mortgage, the value of the mortgage is included in the trustee's total disbursements." Tamm's Br. at 10.

The footnote Tamm champions provides neither clear nor unequivocal support for his position and, indeed, does not even constitute a holding in the decision. More precisely, the Ninth Circuit acknowledged in York that under chapter X, the fee caps in § 76 of the Act simply do not apply: "§ 48 of the Bankruptcy Act (11 U.S.C. § 76) dealing with the compensation of trustees in

---

[12] "For the purposes of calculating the trustee's fee under this section, we treat the assumption of the existing mortgages as a disbursement." In re York, 527 F.2d at 1074 n.12.

-25-

ordinary bankruptcy, is expressly made inapplicable to fees allowed in Chapter X proceedings by 11 U.S.C. § 641[.]"[13] In re York, 527 F.2d at 1073. Section 641 (repealed), applicable in chapter X cases, required only that the bankruptcy court make a determination of the reasonableness of the trustee's compensation, with no fee caps imposed, nor any requirement that compensation be based on moneys disbursed. In other words, the Ninth Circuit's inclusion in York of the value of the assumed mortgage in its determination of reasonable trustee compensation was not inconsistent with chapter X. However, the decision does not speak to whether the same result should apply under § 326(a), a statute that allows bankruptcy courts no discretion in determining maximum trustee compensation.

Rau, decided in 1983, is also a Bankruptcy Act case. Southwest Media, Inc. had filed a chapter XI case, and Albert Rau was appointed receiver and, later, trustee. Southwest Media operated a radio station and had purchased from KBUZ, Inc. two broadcasting licenses and broadcasting equipment for $1,200,000, paying $200,000 down and issuing a promissory note for the $1 million balance. Rau sold all assets of the corporation for $1,500,000, which included assumption of KBUZ's lien. Rau, 708 F.2d at 421. Later, when Rau sought compensation as trustee of

---

[13] Section 76 of the Bankruptcy Act set a cap on compensation of trustees other than trustees in Chapter X, based on a sliding scale of moneys disbursed. Thus, pursuant to § 641 (repealed), there was no fee cap imposed by the Bankruptcy Act on trustees of Chapter X cases, such as In re York. There was only a reasonableness requirement, and the bankruptcy court was free to compensate a trustee with any fee that the court found reasonable. If a court wished to include a mortgage in the fee calculation for a Chapter X trustee, it was free to do so.

-26-

about $66,000, the debtor and other creditors challenged his inclusion of the full sale price, including the value of the liens, in calculating his compensation. Id. at 422.

The important issue before the Rau court was whether the term "moneys disbursed" in calculating trustee compensation was limited to the "net equity value" realized by the estate, or whether that term included the amount of the lien assumed by the purchaser as part of the property sale. In resolving this question, the court in Rau opined that, "When assets of the estate are sold free and clear of liens held by secured creditors, the entire sale price, including the amount used to pay off the liens, is counted for purposes of establishing the trustee's fee base." Rau, 708 F.2d at 423.

Again, Rau is not precedential here. Whether a credit bid should be included in calculation of trustee fees was not argued before the Ninth Circuit, nor was it determined with the full and careful consideration of the court. As with York, any discussion of this issue is dictum.[14] And finally, as Tamm acknowledges in

---

[14] Tamm also cites an unpublished BAP decision to support his argument that York and Rau are precedential. Blair v. Stratton (In re Blair), 2005 WL 2009303 (9th Cir. BAP June 20, 2005). Specifically, Tamm quotes from the Panel's memorandum decision as follows: "The Ninth Circuit adopted the constructive disbursement doctrine in York Int'l Bldg., Inc. v. Chaney, 527 F.2d 1061, 1074 n.12 (9th Cir. 1975)(treating assumption of existing mortgage as a disbursement)).

Blair is no help to Tamm. Blair was an unpublished decision, containing an express warning that the panel did not intend it to be precedential. See also (then) 9th Cir. BAP Local R. 8013-1. In addition, in Blair the Panel was reviewing a bankruptcy court decision involving a "constructive disbursement" by the trustee, in the form of a cash disbursement made from the sale proceeds by an escrow agent acting on instructions from the trustee. The Blair panel never ruled that York and Rau controlled the outcome of the current issue before this Panel.

his brief, it is not clear whether, under the facts stated, the entire sale price in Rau might have been paid in a cash disbursement. If it was, Rau is of little value as support for Tamm's position.

We conclude that York and Rau are neither binding, nor particularly relevant, in deciding the current appeal.

**CONCLUSION**

We believe the plain meaning of the term "moneys disbursed" in § 326(a) as used in calculating the cap on chapter 7 trustee compensation cannot include the Secured Creditors' credit bids in this case. Such a construction is not absurd; under facts such as these, it allows sales by trustees of estate property to secured creditors where no cash is received by the trustee, but does not allow compensation to the trustee based on such sales, where there is no net return to the estate.

We think that the plain meaning of "moneys disbursed," the use by Congress of these terms in other parts of the Code, the statutory context of the Code, and the legislative history instruct that we reject Tamm's interpretation of § 326(a).

Finally, we disagree with Tamm, and the bankruptcy court, that the decisions of the Ninth Circuit construing the Bankruptcy Act support the notion that the Secured Creditors' credit bids be included in computing his fees.

Because we conclude that "moneys disbursed" in § 326(a) does not include the Secured Creditors' credit bids in calculating Tamm's maximum compensation as trustee in this case, we REVERSE the bankruptcy court's order awarding Tamm compensation, and REMAND this matter to the bankruptcy court with instructions to

-28-

recalculate the amount of his compensation consistent with this decision.